1
2
3
4
5
6                **IN THE UNITED STATES DISTRICT COURT**
7                     **FOR THE DISTRICT OF ARIZONA**
8
9   United States of America *ex rel.* Mark          No. CV-13-00864-PHX-DJH
10  McGrath,
                                                     **ORDER**
                             Relator,
11
12  v.
13  Microsemi Corporation, et al.,
14                           Defendants.
15          Pending before the Court is a Motion to Dismiss Relator's First Amended
16  Complaint ("AC") with prejudice by defendants Microsemi Corporation and White
17  Electronic Designs Corporation ("WEDC") (Doc. 34) pursuant to Fed.R.Civ.P. 12(b)(6)
18  and Fed.R.Civ.P. 9(b).[1]
19  **I. Background**
20          **A. Procedural**
21          On April 29, 2013, Relator Mark McGrath commenced this action against
22  Defendants in the name of the United States Government pursuant to the False Claims
23  Act ("FCA"), 31 U.S.C. §  3729 et seq.    After twice extending the seal at the behest of
24  the government, the Honorable Neil V. Wake, to whom this case was previously
25  assigned, ordered that Relator to "be prepared to actively prosecute this case beginning
26  _____
27          [1]     In its discretion, because it will not aid the decisional process, the Court
28  denies Defendants' request for oral argument.  *See* Fed.R.Civ.P. 78; *see also Mahon v.*
    *Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir. 1999); *Partridge v.*
    *Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

March 1, 2014, if the Government does not intervene by then."  Ord. (Doc. 17) at 1:22-24.  As that order also required, on February 28, 2014,  the government notified the Court that it would not be intervening.  Not. (Doc. 18).  A few days later, on March 3, 2014, Relator filed his First Amended Complaint ("AC") (Doc. 19), and on March 11, 2014, Judge Wake ordered that the case be unsealed.  Ord. (Doc. 22).  However, on May 23, 2014, Judge Wake subsequently ordered the resealing of the complaint, the AC and their respective attachments all be resealed.  Ord. (Doc. 37).  Therefore, all cites to the complaint herein are to the redacted version (Doc. 38).

### B.  Factual[2]

---

[2]    Preliminarily, the Court will address Defendants' request to take judicial notice of two documents which the FAC references.  Both are letters from defendant Microsemi to the Directorate of Defense Trade Controls ("DDTC").  *See* Decl'n, exhs. 1-2 (Doc. 34-1); *see also* AC (Doc. 38) at 17-18, ¶ 21.

"[A] as a general rule, a district court may not consider materials not originally included in the pleadings in deciding a Rule 12 motion[.]"  *U.S. v. 14.02 Acres of Land More or Less*, 547 F.3d 943, 955 (9th Cir. 2008); *see also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n. 5 (9th Cir. 2003) (When deciding a Rule 12(b)(6) motion, generally a court must "refrain from considering extrinsic evidence[.]")  Therefore, "[w]hen ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond."  *U.S. v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (citations omitted).  There are two exceptions to these general rules.  The first is the incorporation by reference doctrine and the second is the doctrine of judicial notice.  Under either of those doctrines, a court may consider certain matters beyond the complaint, without converting a motion to dismiss into a summary judgment motion.  *See id.* at 908 (citations omitted).

The incorporation by reference doctrine allows a court to also "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (internal quotation marks and citations omitted). Taking a relatively expansive view of that doctrine, the Ninth Circuit has recognized that "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  *Ritchie*, 342 F.3d at 908 (citations omitted).  Under these circumstances, "the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal quotation marks and citation omitted).  Under either of those doctrines, a court may consider certain matters beyond the complaint, without converting a motion to dismiss into a summary judgment motion.  *See id.* at 908 (citations omitted).

In the present case, because the AC "specifically relies upon Microsemi's Initial Notification of Voluntary Disclosure letter of and its supplement thereto,

- 2 -

Stripped of its rhetoric and hyperbole, the AC alleges as follows.  Relator was employed with WEDC from June 2009 to May 2011. AC (Doc. 38) at 4, ¶ 1.  Defendant WEDC "develops and manufactures microelectronic and display components and systems for high technology products used in military and commercial markets." (*Id.* at 9, ¶ 5).  Some of those technologies are "protected from disclosure or export to foreign persons . . . by the federal International Traffic in Arms Regulation ("ITAR"),[3] 22 C.F.R. §§ 120-130, promulgated pursuant to the Arms Export Control Act ("AECA"), . . . and Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774[.]" (*Id.*) (footnote added).  "A small percentage of Microsemi's products are specifically designed for defense applications and are therefore ITAR-controlled."  Decl'n (Doc. 34-1) at 8.  Similarly, Defendant Microsemi, with employees world-wide,  manufactures a wide range of high technology products for use in a variety of markets, such as aerospace, defense and communications.  AC (Doc. 38) at 5, ¶ 4.   In May 2010, Microsemi completed its acquisition of WEDC, with the latter becoming a wholly owned subsidiary of the former.  (*Id.* at 4-5, ¶ 3).  After this acquisition, Relator was "in charge of the information technology [("IT")] team." (*Id.* at 4, ¶ 1).

During the acquisition process, some discussion ensued between Microsemi and WEDC given what Relator describes as "the extensive use of ITA documents throughout WEDC's computer network."  AC (Doc. 38) at 22, ¶ 27.  Microsemi informed Relator that it was "fully-versed in ITAR" due to having a "lot of facilities that perform ITAR-related work[.]" (*Id.*)  Nonetheless, Relator and his IT team became concerned about possible ITAR violations.  (*Id.* at 22, ¶ 28).  Both WEDC and Microsemi had their own

---

Defendants are requesting that the Court take "judicial notice" of both.  See Mot. (Doc. 34) at 12, n. 4.   Defendants are correct; paragraph 21 of the AC specifically mentions both letters.   Therefore, what Defendants are actually seeking is for the Court to incorporate these letters by reference into the AC – not to take judicial notice of them.  So construed, the Court will incorporate by reference both letters into the AC, especially because this request is unopposed.

[3]      As more fully discussed herein, the ITAR designates certain products as defense articles or technical data and requires exporters to obtain a license or written approval to export the same.

separate "SharePoint" platforms.  (*Id*. at 23, ¶ 29).  "SharePoint is a widely used browser-based collaboration and document management platform from Microsoft."  (*Id*.).   On May 24, 2010, Relator was informed that Microsemi was going to start migrating "WEDC servers and personal computers to Microsemi's network domain."  (*Id*. at 23, ¶ 30).   Also, WEDC was going to start routing all of its e-mails through Microsemi servers."  (*Id*.).   On May 26, 2010, during a conference call with Microsemi, Relator expressed concern that if WEDC's "servers were migrated to Microsemi's network domain[,]"  there was a risk of "unauthorized exposure" to WEDC's "ITAR-protected information[.]"  (*Id*. at 24, ¶ 31).   In July 2010,  Relator continued to express concern to Microsemi "about data falling into unauthorized hands."  (*Id*. at 24, ¶ 33).

Relator "learned[,]" in the fall of 2010, "that Microsemi domain administrators had access to all devices on the Microsemi domain and if unauthorized domain administrators in other countries or divisions had access to confidential data, it could easily be stolen without anyone knowing."  AC (Doc. 38) at 26, ¶ 37.   On October 5, 2010, Dan Tarantine, WEDC's President and General Manager, called Relator asking "about the status of WEDC ITAR documents and whether they were exposed to individuals in other facilities."  (*Id*. at 27, ¶ 38).   Relator answered in the affirmative, explaining that "WEDC was in the process of migrating its servers and computers to the Microsemi domain[,]" meaning "that all domain administrators would have access to all data on WEDC computers."  (*Id*.).

The next day, Relator had a face-to-face meeting with Mr. Tarantine and WEDC's Network Administrator "to discuss network vulnerability vis-a-vis ITAR documents as a result of migrating WEDC's system to the Microsemi domain."  AC (Doc. 38) at 28, ¶ 39. During this meeting, Microsemi's General Manager was contacted to discuss this "potential exposure" issue and how Microsemi "might be mitigating [it]."  (*Id*. at 28, ¶ 39).  The WEDC employees advised Microsemi that they had been able to access the server of a Microsemi facility in California and were "easily" able to download some of its files.  (*Id*.).   Additionally, servers in Ireland and Israel were accessible.  (*Id*.).

Among other things, Microsemi's GM   advised that he would be contacting that California facility's security officer, who had previously held an IT-related position. (*Id*.)

Shortly thereafter, several government agencies became involved.  On October 7, 2010, Relator, WEDC's GM, Mr. Tarantine, and its Network Administrator, Mr. Luna, as well as Microsemi's Human Resources and Facility Security Officer, met with a Special Agent with the Federal Bureau of Investigation.  This group informed the Special Agent of the allegedly "pervasive security breaches."   AC (Doc. 38) at  28, ¶ 40.    The next day, Relator and Messrs. Tarantine and Luna had another meeting.  This time a Special Agent from the Defense Security Service ("DDS") was present, as well as representatives from the Department of Homeland Security and from Immigration and Customs Enforcement.  (*Id*. at 29, ¶ 41).  "The outcome was a decision that WEDC should continue operating as normal to allow time for" the Special Agent "to contact the State Department." (*Id*.)

Later in October 2010, a WEDC business analyst informed Relator that a firewall had been installed between WEDC and Microsemi.   AC (Doc. 38) at 32, ¶ 47.   Relator responded by sending an e-mail entitled "'Immediate Domain Separation Notification[.]'"  (*Id*.)  Relator cited ITAR violations as the reason for the "'physical domain separation[.]"  (*Id*.)   Microsemi was displeased, believing that Relator should have contacted it prior to commencing the domain separation.  (*Id*. at 33, ¶ 50).  And, in any event, Microsemi did not want to maintain more than one domain.  (*Id*. at 34, ¶ 50).

As part of the ongoing governmental investigation, the decision was made to shut down WEDC's server "because the firewall was not sufficient to protect the data."  AC (Doc. 38) at 34, ¶ 50.   On October 25, 2010, Microsemi's Chief Executive Officer received an e-mail from DDS stating "that WEDC was to immediately start the physical domain separation process." (*Id*. at 35, ¶ 51).  On that same date, the three foreign nationals who could potentially access ITAR-controlled information stored on Microsemi's United States systems, "were removed as domain administrators and given a lower access level[.]"  Decl'n, exh. 2 (Doc. 34-1) at 9.

By letter dated November 11, 2010, pursuant to 22 C.F.R. § 127.12(c), Microsemi submitted an "Initial Notification of Voluntary Disclosure of Microsemi[]: Relating to possible Access to Technical Data by foreign nationals[.]" Decl'n, exh. 1 (Doc. 34-1) at 4; *see also* AC (Doc. 38) at 17, ¶ 21. Microsemi provided this notification to the Office of Defense Trade Controls Compliance ("DTCC"). Microsemi informed DTCC of a "*possible* gap in IT systems that *may* have enabled there foreign national employees from Ireland, Israel and the United Kingdom to gain access to servers that contain ITAR-controlled information without authorization from [DDTC]." (*Id*.) (emphasis added). Microsemi further informed DTCC that it had "no reason to believe that violations involved proscribed countries or nationals from proscribed countries occurred, or that any foreign national actually accessed ITAR-controlled data, or that any 'deemed export' occurred with respect to such data." (*Id*.). After "conducting a full review of ITAR-related activities and [Microsemi's] IT systems[,]" Microsemi indicated that it would be submitting a complete report "consistent with the requirements of Section 127.12." (*Id*.).

In a February 15, 2011 letter, Microsemi supplemented its initial notification to DTCC. In submitting this "voluntary disclosure of possible inadvertent [ITAR] violations[,]" Microsemi confirmed that due to an "IT gap[,] . . . three foreign national IT employees located outside the United States . . . , had access to serves in the United States that contain ITAR-controlled information." Decl'n, exh. 2 (Doc. 34-1) at 7. Microsemi informed the DTCC that "[b]ecause of their status as domain administrators on [its] IT systems, there three foreign nationals had the ability to access unclassified ITAR-controlled information residing on Microsemi servers in the United States." (*Id*.). Microsemi further informed the DTCC that after an internal review, "[a]ll available information suggest[ed] that there was no unauthorized access[,]" and that "the gap in the IT systems was an oversight that had not been addressed in [its] policies and procedures, and specifically the technology control plans that apply to ITAR-controlled data." (*Id*. at 8).

This lawsuit ensued, wherein Relator alleges that "Microsemi violated the [FCA]

by causing WEDC and other subsidiary entities or corporate divisions to make false claims for payment for shipment of ITAR- and EAR-protected components for use in numerous military programs, while Microsemi was simultaneously exporting protected technical data through a single Microsemi network domain, without legal authority."  AC (Doc. 38) at 21, ¶ 26.  Relator claims that during his employment with WEDC, he discovered that WEDC had violated the FCA "from at least 2009 and was continuing to do so when he departed in May 2011.  (*Id*. at 9-10, ¶ 6).  Tracking the language of the FCA, Relator alleges that "[b]y knowingly seeking payment for goods where Microsemi violated the contractual and legal requirements governing the export of defense articles and services, Microsemi presented or caused false claims to be presented by WEDC, . . . , for payment or approval and used or caused to be used false statements or records material to false or fraudulent claims, all in violation of 31 U.S.C. §§ 3729(a)(l)(A) and (a)(l)(B)."  (*Id*. at 11, ¶ 9).  Relator alleges "actual damages to the United States from 2008 until 2011 of "approximate[ly] . . . $1.6 billion or more."  (*Id*. at 41, ¶ 66).

## II. Discussion

### A.  Governing Legal Standards

The Ninth Circuit has held that "[t]he heightened pleading standard of Rule 9(b) governs FCA claims." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011) (citing *Bly–Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001)).  "Rule 9(b) provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'"  *Id*. (at 1054-1055) (quoting Fed.R.Civ.P. 9(b)).  "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'"  *Id*. at 1055 (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks and citations omitted)).  Rule 9(b)'s particularity requirement serves several purposes.  It "give[s] notice to defendants of the specific fraudulent conduct against which they must defend[;] it also "deter[s] the filing of complaints as a pretext for the discovery of

unknown wrongs[.]"  *Bly-Magee*, 236 F.3d at 1018) (internal quotation marks and citations omitted).  In this way, too, defendants are "protect[ed] . . . from the harm that comes from being subject to fraud charges[.]"  *Id.* (internal quotations, citations and alternations omitted).  Finally, Rule 9(b) "prohibits plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."  *Id.* (internal quotation marks and citations omitted).

"Because Rule 8(a) requires the pleading of a plausible claim," the Ninth Circuit in *Cafasso*, held "that claims of fraud or mistake—including FCA claims—must, in addition to pleading with particularity, also plead plausible allegations."  *Cafasso*, 637 F.3d  at 1055 (citation omitted).  This is in keeping with the view that a motion to dismiss a complaint under Rule 9(b) for failure to plead fraud with the particularity, is the "functional equivalent" of a Rule  12(b)(6) motion for failure to state a claim.  *Vess v. Ciba-Geiby Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003).  For these reasons, and because Defendants are seeking dismissal under both Rule 9(b) and Rule 12(b)(6), the Court will outline the pleading standards of Rule 12(b)(6) as well.

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003).  A complaint must contain a "short and plain statement showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a)(2). "All that is required are sufficient allegations to put defendants fairly on notice of the claims against them." *McKeever v. Block*,  932 F.2d 795, 798 (9th Cir. 1991).  Rule 8 requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" however.  *Iqbal*, 556 U.S., at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2009)).  A complaint that provides "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Nor will a complaint suffice if it presents nothing more than "naked assertions" without "further factual enhancement." *Id.* at 557.

A complaint need not contain detailed factual allegations to avoid a Rule 12(b)(6) dismissal, but it must plead "enough facts to state a claim to relief that is plausible on its

face." *Twombly*, 550 U.S., at 570. "A complaint has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S., at 678 (citing *Twombly*, 550 U.S., at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (internal quotation marks and citation omitted).

"The Court may find a claim plausible when a plaintiff pleads sufficient facts to allow the Court to draw a reasonable inference of misconduct, but the Court is not required 'to accept as true a legal conclusion couched as a factual allegation.'" *Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Iqbal*, 556 U.S., at 678 (internal quotation marks and citation omitted)). Likewise, a complaint that provides "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S., at 555. Nor will a complaint suffice if it presents nothing more than "naked assertions" without "further factual enhancement." *Id*. at 557. "Determining whether a complaint states a plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S., at 679 (citation omitted). These essential *Iqbal/Twombly* pleading requirements will guide the Court's analysis "to determine whether the factual allegations, which are assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Landers v. Quality Communications, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S., at 679), *cert. denied.*, 135 S.Ct. 1845 (April 20, 2015).

**B.  False Claims Act**

"The FCA was enacted during the Civil War in response to overcharges and other abuses by defense contractors." *Hooper  v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012) (internal quotation marks and citation omitted). "The purpose of the FCA

was to [combat] widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government." *Id.* (internal quotation marks and citation omitted).  "The Supreme Court has refused to adopt a restrictive reading of the statute, however, holding that the FCA is a 'remedial statute [that] reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money.'" *United States ex rel. Modglin v. DJO Global Inc.*, 48 F.Supp.3d 1362, 1385 (C.D.Cal. 2014) (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 233  (1968)) (other citation omitted).  By the same token, however, "the FCA is not a catchall anti-fraud provision—it 'attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment.'" *United States ex. rel. Campie v. Gilead Sciences, Inc.*, 2015 WL 106255, at *14 (N.D.Cal. Jan. 7, 2015) ("*Campie I*") (quoting *Cafasso*, 637 F.3d at 1055) (other citation and internal quotation marks omitted).

"As one enforcement mechanism, the FCA authorizes private parties, known as 'relators,' to bring civil *qui tam* suits on the government's behalf against entities who have allegedly defrauded the government." *Hartpence*, 792 F.3d at 1123   *Id.* (quoting 31 U.S.C. § 3730(b)(1)). "In these suits, the relators seek reimbursement of the defrauded amounts on the government's behalf." *Id.*   "Where, as here, the government declines to intervene in the suit, the relator stands to receive between 25% and 30% of any recovery." *Id.* (citing 32 U.S. § 3730(d)(2)).

In his one count AC, Realtor alleges that Defendants violated 31 U.S.C. §§ 3729(a)(1)(A) and (B).  Those statutes "create[] liability for any person who, *inter alia*, '(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *Hooper*, 688 F.3d at 1047 (quoting 31 U.S.C. § 3729(a)(1)).   The FAC defines "knowingly" as having "actual knowledge of information[,]" or acting in either "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information[.]" 31 U.S.C. §  3729(b).

"The FCA does not define false." *United States v. Bourseau*, 531 F.3d 1159, 1164 (9th Cir. 2008).   "Rather, courts decide whether a claim is false or fraudulent by determining whether a defendant's representations are accurate in light of applicable law." *Id.* (citation omitted).   The prerequisites for liability under 31 U.S.C. §§ 3729(a)(1)(A) and (B) "are virtually identical, with the only difference being whether Defendants submitted a false claim or made a statement material to such a claim[.]" *United States ex rel. Bailey v. Gatan, Inc.*, 2015 WL 1291384, at *4 (E.D.Cal. March 20, 2015).   Therefore, in its analysis the Court will not distinguish between the two.   *See id* (jointly addressing two such claims).

There are several theories of FCA liability.   "The prototypical false claims action alleges a factually false claim, *i.e.*, an explicit lie in a claim for payment, such as an overstatement of the amount due." *Modglin*, 48 F.Supp.3d at 1387 (citations omitted). "Factually false claims arise when 'the government payee has submitted 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.''" *Guardiola*, 2014 WL 4162201, at *3 (quoting *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir .2008)) (citing *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)).   "'Factual falsity' simply means a provider may not bill for something it does not provide." *Id.*

"The False Claims Act, however, is not limited to such facially false or fraudulent claims for payment." *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006). "Rather, the False Claims Act is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Id.* (citing *Neifert–White Co.*, 390 U.S. at 232). "'[E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.'" *Id.* at 1170–71 (quoting S.Rep. No. 99–345, at 9 (1986), *reprinted in* 1986 U.S.C. C.A.N. 5266, 5274).   In *Hendow*, the Ninth Circuit explained that "[t]he principles embodied in this broad construction of a 'false or

fraudulent claim' have given rise to two doctrines that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false: (1) false certification (either express or implied); and (2) promissory fraud[,]" or "'fraud-in-the-inducement[.]'" *Id.* at 1171(citation omitted); 1173.

In addition, "regardless of any false certification conduct[,]" the Ninth Circuit also has recognized that in an "appropriate case, knowingly billing for worthless services or recklessly doing so with deliberate ignorance may be actionable under § 3729[.]" *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001). This theory is derivative of a factually false claim and is commonly referred to as a "worthless services" or "worthless products" theory of FCA liability. *See Campie I*, 2015 WL 106255, at *13-*14. Such a claim "is independent of any false certification claim." *United States ex. rel. Campie v. Gilead Sciences, Inc.*, 2015 WL 3659765, at *8 (N.D.Cal. June 12, 2015) ("*Campie II*") (citing *Mikes*, 274 F.3d at 703 ("[A] a worthless services claim is a distinct claim under the [FCA]. It is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided.")).

Defendants argue that due to a host of pleading defects, Relator has failed to state a FCA claim, whether such claim is based upon a theory of factual falsity, worthless products, fraud in the inducement, express false certification or implied false certification. Relator's response addresses only two of these theories. First, Relator contends that he has pleaded factual falsity based upon a worthless products theory. Second, Relator contends that he has sufficiently alleged implied false certification. In his response, the Relator did not address the other possible theories of FCA liability which Defendants discuss in their motion. The Court deems Relator's silence to be a concession that he is pursuing only two theories of FCA liability -- worthless products and implied false certification. The Court will limit its analysis accordingly.

. . . .

. . . .

### 1. Factual Falsity

According to Relator, he has sufficiently pled factual falsity premised upon allegations that Defendants' products were worthless.  A few Circuits, including the Ninth, have adopted the "worthless services" or "worthless products" theory of FCA liability, which "allows a *qui tam* relator to bring claims for violations of the FCA premised on the theory that the defendant received reimbursement for products or services that were worthless."  *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 706 (7th Cir. 2014) (citing *Mikes*, 274 F.3d at 703; *SmithKline Beecham*, 245 F.3d at 1053; *see also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468–69 (6th Cir. 2011); *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824 (8th Cir. 2009)).  As the Ninth Circuit reasoned, "assum[ing] that a party to a government contract knowingly or with deliberate ignorance charged the government for worthless services, then there would be fraud on the government that may be pursued under the FCA."  *SmithKline Beecham*, 245 F.3d at 1053.  In the seminal case of *Mikes*, the Second Circuit explained that "the performance of the service [must be] so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes*, 274 F.3d at 703; *see also Chesbrough*, 655 F.3d at 468 (liability exists when a medical contractor "[seeks] reimbursement for services that it were not just of poor quality but had no medical value).

"Courts applying this . . . 'worthless services' theory have interpreted it narrowly." *Campie I*, 2015 WL 106255, at *14.  Fairly recently, "the Seventh Circuit noted that it is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for.  That is, a 'diminished value' of services theory does not satisfy this standard.'"  *Id.* (quoting *Momence*, 764 F.3d at 710).  Simply put, "[s]ervices that are 'worth less' are not 'worthless.'"  *Id.*  The *Momence* Court, "therefore, rejected the contention that FCA liability could be based simply on the fact that a good or service had a diminished value *or* was non-conforming in some respect."  *Id.* (citation omitted) (emphasis added).  As can be seen, "courts strictly interpret the term 'worthless'

in this context."  *United States ex rel. New Mexico v. Deming Hosp. Corp.*, 992 F.Supp.2d 1137, 1147 (D.N.M. 2013) (citation omitted).

Applying these principles to the AC readily shows, as Defendants argue, that Relator has not sufficiently alleged a factually false certification claim based on worthless products.  In a section entitled "governing law[,]" the AC alleges that "[m]ilitary products that can be reverse engineered or whose technological information has been compromised are worse than worthless to the United States."  AC  (Doc. 38) at 12-13, ¶ 14.  This generic, hyperbolic statement is not governing law.  And, more importantly for present purposes, this allegation is nothing more than a "naked assertion" completely void of "further factual enhancement."  *See Twombly*, 550 U.S., at 557.  Elsewhere in the FAC, in similarly broad language, it alleges that "Microsemi caused WEDC to make false claims for payment in every invoice to a Government contractor or subcontractor for a product whose technology is ITAR- or EAR-protected; because the data were not protected from foreign disclosure, the products were *worthless*, rendering the claims for payment false."  FAC (Doc. 38) at 39, ¶ 63 (emphasis added).  This allegation, even when read together with other allegations in the FAC, does not suffice to state a worthless products claim.

Citing only to the two paragraphs just quoted, Relator asserts that he has "alleged with *great particularity* the circumstances that caused every product purchased by the Government from prime contractors who purchased components containing ITAR or EAR-protected data to be, at a minimum, dramatically diminished in value if not worthless."  Resp. (Doc. 41) at 7:6-13 (footnote omitted) (emphasis added).   Obviously, he has not.  These two paragraphs, even in combination, do not provide the requisite particularity.  Nor, on their face, do these paragraphs state a plausible worthless products claim.  Thus, the Court agrees with Defendants that the FAC's mere recitation of the "legal conclusion that 'the products were worthless' is no substitute for [the] well pled facts[]" which *Iqbal* demands.  *See* Reply (Doc. 50) at 9:11-12 (citation omitted).

Relator cannot, as he attempts to do, salvage his worthless products claim based upon his purported "identifi[cation] [of] a number of products . . . whose technical data

- 14 -

were *compromised* because they were visible to hundreds of unauthorized foreign persons both in and out of the United States . . . and described the confidential technologies exposed."  Resp. (Doc. 41) at 7:24-3 (footnote omitted) (emphasis added). From Relator's standpoint, just because the government does not know whether any of the "protected data has been further disseminated, . . . if at all[,]" does not mean that "[t]he value to the United States of products whose ITAR- and EAR-protected technical data has been disclosed" is any "less diminished[.]"  (*Id*. at 8:3-10).  Based upon the foregoing, Relator maintains that he has "plausibly pleaded . . . that value of these products has been *compromised*."  (*Id*. at 8:15-16) (emphasis added).  Even if the Court were to accept this proposition, which it does not, it is not enough to plead that "the value of products has been compromised."  (*See id.*)  This is akin to the "diminished value" theory which courts have held does not suffice to support a worthless products claim.

Relator's worthless products claim fails for other reasons as well.  First, generally courts have limited the scope of a worthless products claim to the health care context. *See Campie II*, at * 8 ("To have a factually false certification claim based on worthless services, the services must be *medically worthless*.") (citing *Smithkline Beecham*, 245 F.3d at 1053) ("The district court ... over-looked the allegations ... that supported a different theory—that SmithKline violated the FCA by seeking and receiving payment for *medically worthless* tests.") (emphasis added); *Mikes*, 274 F.3d at 702 ("[A] worthless services claim asserts that the knowing request of federal reimbursement for a procedure with no *medical* value violates the Act irrespective of any certification.") (emphasis added); *Chesbrough*, 655 F.3d at 468 ("If VPA sought reimbursement for services that it knew were not just of poor quality but had *no* medical value, then it would have effectively subm[]itted claims for services that were not actually provided.") (emphasis in original)); *but see United States ex rel. Badr v. Triple Canopy, Inc.*, 950 F.Supp.2d 888, 898 (E.D.Va. 2013) (citation omitted) ("worthless services" claim not sufficiently alleged, not because the context was non-medical, but because the government did not sufficiently allege that the services of Ugandan guards  pursuant to a government contract, who were to provide security at a United States military installation, "were

- 15 -

entirely devoid of value or that the noncompliance with the weapons qualification requirement caused any injury to the Government such that the guards effectively provided no service at all[]"), *aff'd in part, rev'd in part on other grounds*, 775 F.3d 628 (4th Cir. 2015), *pet. for cert. filed*, No. 14-1440 (June 8, 2015).  In the absence of any authority or argument from Relator, the Court declines to broaden the scope of the worthless products theory to encompass the AC's allegations herein.

Second, the Court agrees with Defendants that "allegations of mere regulatory nonconformance" do not suffice to state a FCA claim on a worthless products theory. Reply (Doc. 50 at 9:15) (citing *United States ex rel. Blundell v. Dialysis Clinic, Inc.*, 2011 WL 167246, at * 21 (N.D.N.Y. Jan. 19, 2011) (Plaintiff did not state a worthless services claim based upon the theory that Defendant's medical services did not conform with certain regulatory guidelines).   Third, Relator's contention that "whether the products are worthless or merely diminished in value to the Government is a question of fact for the jury[]" misses the mark.  See Resp. (Doc. 41) at 8:13-16.  In making this contention, Relator mistakenly assumes that he has sufficiently pled a worthless products claim, but he has not.  Lastly, Relator does not allege the requisite scienter under the purported "worthless products" theory, because he has not alleged that Defendants provided the government with worthless products, knowing that they were worthless when provided.  *See United States ex rel. McMasters v. Northrop Grumman Ship Sys., Inc.*, 2006 WL 2884415, at *4 (N.D. Cal. Oct. 10, 2006).   Accordingly, the Court finds that Relator has not adequately pled a worthless products theory of FCA liability.

### 2.  Implied False Certification

"A claim under the FCA can be based on the allegation that a party has falsely certified compliance with a statute or regulation as a condition to government payment." *United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011) (citing *Hendow*, 461 F.3d at 1171).  "False certifications[4] come in two varieties—express and implied[.]"

---

[4]      "The term 'certification' in this context does not carry with it any talismanic significance, but is 'simply another way of describing a false statement made to the government.'"  *Campie I*, 2015 WL 106255, at *3 (quoting *Gonzalez v. Planned Parenthood of L.A.*, 2012 WL 2412080, at *4 (C.D. Cal. June 26, 2012), [*affirmed on*

*Campie.*, 2015 WL 106255, at *8.  In moving for dismissal, Defendants contend that the AC does not adequately plead either.  In rejoinder Relator asserts that that he "has pleaded *implied* certification."   Resp. (Doc. 41) at 8:18 (bold emphasis omitted) (italicized emphasis added).  Given this unequivocal statement, and Relator's silence on the issue of express certification, as alluded to earlier, the Court limits its inquiry to whether the AC sufficiently alleges implied false certification.

    "Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim."  *Ebeid*, 616 F.3d at 998.  "[T]he essential elements of" a false certification claim (express or implied) are:  "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *Hendow*, 461 F.3d at 1174.  Notably, with the exception of scienter, which may be generally pled, these elements must satisfy Rule 9(b)'s heightened pleading requirements. *See Corinthian Colleges*, 655 F.3d at 992.  Very basically, Defendants contend that they are entitled to dismissal because Relator has not adequately alleged any of the four "essential elements" of an implied false certification claim.

### a.  Compliance as a Condition of Payment

    In *Hopper United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996), an early Ninth Circuit express false certification case, the Court "held that '[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA.'"  *Ebeid*, 616 F.3d at 997 (quoting *Hopper*, 91 F.3d at 1266).  As the Ninth Circuit has stressed, whether under a theory of express or implied false certification, "'[i]t is the false

_____

*other grounds*, 759 F.3d 1112 (9th Cir. 2014), *cert. denied* 135 S.Ct. 2313 (2015)]; (citing *Hendow*, 461 F.3d at 1172 (rejecting view that the "word 'certification' has some paramount and talismanic significance")).

*certification* which creates liability when certification is a prerequisite to obtaining a government benefit.'" *Id*. (emphasis added by *Ebeid* Court)(quoting *Hopper*, 91 F.3d at 1266).  "Likewise, materiality is satisfied under both theories only where compliance is 'a *sine qua non* of receipt of state funding.'"  *Id*.  (quoting *Hopper*, 91 F.3d at 1267).  Therefore, in *Hopper*, Relator did not state a cognizable FCA claim because, quite simply, the defendant "did not have [to] comply with regulations in order to receive government funds."  *United States ex rel. Holder v. Special Devices, Inc.*, 296 F.Supp.2d 1167, 1174 (C.D.Cal. 2003) (citing *Hopper*, 91 F.3d at 1267) (footnote omitted).

Defendants argue that the present case is no different than *Hopper* and its progeny. Relator has not sufficiently alleged implied false certification because "[c]ompliance with ITAR is [n]ot a [p]rerequisite to [p]ayment[.]"  Mot. (Doc. 34) at 8:3-4 (emphasis omitted).  Relator counters more broadly that "'[c]ondition of payment' is no longer an element of FCA liability."  Resp. (Doc. 41) at 9:20 (emphasis omitted).  The Court gives no credence to this assertion, and further agrees with Defendants that ITAR compliance is not a condition of payment here.

Relator premises his argument that condition of payment is no longer an element of FCA liability upon the Fraud Enforcement and Recovery Act of 2009 ("FERA").  Prior to FERA, section 3729 of the FCA "did not expressly contain a materiality requirement[.]"  *United States ex. rel. Putnam v. Eastern Idaho Regional Medical Center*, 696 F.Supp.2d 1190, 1197 (D.Idaho 2010).  However, as Relator notes, FERA amended the FCA to include such a requirement, with "material" meaning "'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  Resp. (Doc. 41) at 10:5-7 (quoting 31 U.S.C. § 3729).  Since the FERA amendments, the Ninth Circuit has not yet had occasion to "address[] the continuing viability of the 'precondition for payment requirement'" under the FCA.  *Id*. at 10:4-5.  Nonetheless,  Relator posits that a "[r]ecent Ninth Circuit district court and other federal court decision*s*[,][5] . . . have correctly omitted or ignored 'prerequisite for payment' or 'sine

---

[5]       Relator actually only cites to one other federal court decision.  Use of the

qua non' as an element of . . . implied certification liability." (*Id.*) at 10:3-11 (footnote omitted) (emphasis and footnote added).   Relator urges this Court to do the same.   The Court declines to do so because Relator's position is problematic for several reasons.

Even if the Court were to agree with Relator's view (which it does not), that post-FERA other courts have "*correctly* omitted or ignored" the "prerequisite for payment" element of implied false certification, this Court will not do the same.  *See Resp.* (Doc. 41) at 10: 9-10 (emphasis added).   This Court is not free to "omit" or "ignore" the condition of payment aspect of a false certification claim, especially in the face of the Ninth Circuit's clear pronouncements outlined above.  The Court realizes that those Ninth Circuit cases were decided prior to FERA, but as Defendants soundly reason, FERA's "confirm[ation] of an existing materiality standard[6] does nothing to alter the requirement that payment be clearly conditioned on compliance with the relevant regulation."  Reply (Doc. 50) at 4:15-17.   Therefore, this Court will continue to rely upon *Hopper* and its progeny requiring that the certification be both "material to the payment made by the government, *Hendow*, 461 F.3d at 1171, and . . . be a prerequisite to obtaining the government benefit, *Hopper*, 91 F.3d at 1266."  *See   United States ex rel. Fryberger v. Kiewit Pacific Company*, 2013 WL 5770514, at *10 (N.D.Cal. Oct. 24, 2013).

By the same token though, despite Defendants' contrary assertion,[7] there is no requirement that the underlying regulation "'*expressly*' condition payment on compliance[,]" as Relator suggests.  Resp. (Doc. 41) at 11:9-11 (footnote omitted).   In *Mikes*, to which Defendants cite, in the Medicare context the Second Circuit did "require[] that the underlying statute 'expressly' condition payment on compliance[.]"

---

plural suggests that there are others, but Relator did not cite to any.

[6]    "Although § 3729 did not expressly contain a materiality requirement before FERA added one in 2009, the Ninth Circuit and at least five other circuit courts previously held that the government must also prove that the false statement was material." *Putnam*, 696 F.Supp.2d at 1197 (citing *Bourseau*, 531 F.3d at 1170–71).

[7]    Reply (Doc. 50) at 3:7-8 (italicized emphasis added) (other emphasis omitted) ("No Claims Were False because Payment is not *Expressly* Conditioned on Compliance with ITAR[.]");

*Ebeid*, 616 F.3d at 998 (internal quotations, citation and footnote omitted).  However, the Ninth Circuit's "precedent contain no such limitation."  *Id.* (citing *Hendow*, 461 F.3d at 1177) (footnote omitted).  And, in *Ebeid*, the Ninth Circuit found no need to adopt the Second Circuit's "express condition" requirement because Relator's claim failed in any event.  *See id.* at 998, n. 3.  Thus, in the present case, Relator need not allege that there is an ITAR regulation which expressly conditions payment on compliance.  This is not enough to rectify Relator's otherwise deficient implied false certification claim, though, as discussed next.

Turning to the narrower issue of whether compliance with ITAR is a condition of payment, the Court finds that it is not.  The Ninth Circuit's decision in *Ebeid*, 616 F.3d 993, is instructive in terms of "distinguish[ing] between statutes and regulation which could form the basis of an implied certification theory and those which could not.  *See Campie I*, 2015 WL 106255, at *10.  In *Ebeid*, the relator brought a FCA lawsuit against the owner of three health care businesses alleging that they "engaged in the 'unlawful corporate practice of medicine[.]'"  *Ebeid*, 616 F.3d at 995.  The relator also alleged that referrals among the health care businesses were unlawful under the Stark Act, 42 U.S.C. § 1395nn(a)(1).   Positing that this alleged misconduct rendered "fraudulent every claim for Medicare reimbursement" Defendants submitted, Relator sought to hold them liable for implied false certification.  *See id.*

The Stark Act limits certain physician referrals.  Essentially a physician may not refer a Medicare patient to any entity in which the physician has a prohibited "financial interest."   41 U.S.C. § 1395nn(a)(1).   The Stark Act unequivocally states that "[n]o payment may be made under this subchapter for a designated health service which is provided in subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).  Relying upon this language, the Ninth Circuit found that the alleged Stark Act violations "may provide a valid basis from which to imply certification, because [the Act] expressly conditions payment on compliance."  *Ebeid*, 616 F.3d at 1000.  Relator's FCA claim based upon alleged Stark violations ultimately failed though because he did not "meet the threshold

requirement of particularity" as to such a claim.  *Id*. at 1000 n. 6.

In *Ebeid*, Relator's alternative implied false certification theory was that the submitted Medicare claims "were false because the health care businesses were engaged in the unlawful corporate practice of medicine."  *Ebeid*, 616 F.3d at 999-1000 (internal quotation marks omitted).  Critically, the Relator's complaint did "not refer to any statute, rule, regulation, or contract that conditions payment on compliance with state law governing the corporate practice of medicine."  *Id*. at 1000.  Instead, Relator "baldly assert[ed] that had [Defendants] not concealed or failed to disclose information affecting the right to payment, the United States would not have paid the claims."  *Id*.  (internal quotation marks omitted).   The Ninth Circuit held that this "conclusory allegation" was "insufficient under Rule 9(b)[]" to state an implied false certification claim premised upon Defendants' alleged violation of the Arizona common law prohibition on the corporate practice of medicine.  *Id*.

Relator's AC herein suffers from the same deficiency, as Defendants stress. Nowhere in his complaint does Relator "refer to any statute, rule, regulation, or contract that conditions payment on compliance with [ITAR]."  *See Ebeid*, 616 F.3d at 1000. Rather much like the conclusory allegation in *Ebeid*, Relator summarily alleges that "[t]he United States paid claims that would not have been paid but for Defendants' unlawful conduct[,]" *i.e.*, alleged ITAR violations.  Co. (Doc. 38) at 43, ¶ 77.  Moreover, as Defendants are quick to point out, Relator concedes that "ITAR and EAR . . . are not directed[] . . . at contracts for the purchase of goods by the United States[.]"  Resp. (Doc. 41) at 14:3-6.  Instead, even from Relator's perspective, "the export control statutes and regulations, including ITAR and EAR are directed at protecting national security[.]"  (*Id*.) at 14:10-11 (emphasis omitted).   Indeed, Relator explains that "the gravamen of this complaint is that Defendants recklessly compromised national security in violation of contractual provisions in each of their contracts with a prime contractor for export-controlled goods and made false certifications of compliance with these national security protection standards."  (*Id*. at 11-16).  "But, 'breach of contract claims are not the same as

fraudulent conduct claims, and the normal run of contractual disputes are not cognizable under the [FCA].'"  *Caffasso*, 637 F.3d at 1057-1058 (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 383 (4th Cir. 2008)).

Even in the face of the foregoing, Relator insists that he has "alleged that compliance with ITAR and EAR are conditions of payment[.]"  Resp. (Doc. 41) at 12:11. Relator refers to allegations in the AC pertaining the Defense Federal Acquisition Regulations ("DFAR").  *See* AC (Doc. 38) at 12, ¶ 13; 15, ¶ 16.  Regulations such as these, "requir[ing] that contracts . . . involv[ing]  export-controlled items, . . . contain a compliance clause," as the AC alleges, are not the equivalent of regulations conditioning payment upon compliance though.  *See* AC (Doc. 38) at 15, ¶ 16; *see also id.*  at 12, ¶ 13. A compliance clause requirement stands in sharp contrast to, for example, the Stark Act's unequivocal language that "[n]o payment may be made . . . for a designated health service which is provided in violation of . . . this section."   See 41 U.S.C. § 1395nn(g)(1).   As is plainly clear, the glaring omission here is the absence of any allegations in the AC referencing, much less identifying, a "statute, rule, regulation, or contract that condition[ed] payment on compliance with [ITAR.]"  *See Ebeid*, 611 F.3d at 1000.   This omission is fatal to Relator's implied false certification theory of FCA liability.

It stands to reason that ITAR compliance is not a prerequisite to payment, Defendants contend, given that "there is a robust alternative scheme for enforcing the AECA and ITAR."  Mot. (Doc. 34) at 9:5-6.   Permitting Relator to proceed on his FCA claim based upon alleged ITAR violations would, from Defendants' standpoint, impermissibly supplant regulatory discretion under this scheme.   Relator's position, however, is that the FCA "simply provides an alternate remedy to the Government." Resp. (Doc. 41) at 15:9.

There is undoubtedly a fairly comprehensive regulatory scheme to ensure ITAR compliance, as Relator alleges.  *See* AC (Doc. 38) at 14-15, ¶ 15.  This scheme encompasses the imposition of civil and criminal penalties, including fines and

imprisonment.  *See id*.  In addition, the AECA gives the Secretary of State sweeping authority to "revoke, suspend or amend licenses or other written approval whenever the Secretary deems such action to be advisable."  22 C.F.R. § 128.1.  Therefore, persons who violate AECA or the regulations promulgated thereunder, such as ITAR, are subject to debarment, suspension or ineligibility.  *See* AC (Doc. 38) at 14-15, ¶ 15 (citing 48 C.F.R. §§  9.406-1, 9.406-2(a), (c), 9.407.1[,] 9.407-2(a), (c)).  "The administration of the [ACEA] is a foreign affairs function[,]" the exercise of which is "highly discretionary," and as such "is excluded from review under the Administrative Procedure Act."  *Id.*

The existence of this scheme, which implicates "the security and foreign policy of the United States[]" is not dispositive of this Court's finding that ITAR compliance is not a prerequisite to government payment.  *See* 22 C.F.R. § 128.1.  At the same time, the existence of this scheme strongly suggests that imposing FCA liability here, especially based upon alleged ITAR violations, would usurp impermissibly the discretion of those entrusted with ensuring compliance with the ACEA.  *See Campie I*, 2015 WL 106255, at *12 (quoting *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 702 (4th Cir. 2014) (quoting, in turn,  *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 307 (3d Cir. 2011))  ("When an 'agency has broad powers to enforce its own regulations, as the FDA does . . . , allowing FCA liability based on regulatory non-compliance could 'short-circuit the very remedial process the Government has established to address non-compliance with those regulations.'''").

### b.  Actual ITAR Violation

Another fundamental flaw in the AC, according to Defendants, is that Relator has not "plead that Defendants *falsely* certified compliance because Relator has not pled a violation of ITAR[.]"  Reply (Doc.50) at 7:5-6.  Relator strenuously disagrees.  Relator retorts that that Defendants "disclosed[] all . . . of WEDC's  ITAR-EAR-protected-technical data to unauthorized persons by migrating WEDC's domain and its SharePoint environment[] to the same domain as Microsemi and all its subsidiaries and divisions worldwide, without regard to whether individual users were U.S. persons or foreign

persons pursuant to the export laws and regulations[.]"   Resp. (Doc. 41) at 17:2-10 (emphasis and footnote omitted).

Essentially, ITAR regulations prohibit the "export" of certain "defense article[s] or technical data" without a license.   22 C.F.R. § 127.1(a)(1).   ITAR regulations define "export" in several ways, including "sending," "taking," "transferring," or "disclosing." 22 C.F.R. §§ 120.17(a)(1)-(4).   The regulations do not, however, define any of these exemplars of "exports."   The regulations do define "technical data" and "defense articles" though.   "[T]echnical data" subject to ITAR-restricted export "includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation."   22 C.F.R. § 120.10(a)(1).   "Defense articles" subject to ITAR-restricted export are, among other things, those "on the U.S. Munitions List[.]"   22 C.F.R. § 120.10(a)(2). Furthermore, ITAR regulations prohibit disclosures or transfers of such technical data to a "foreign person." 22 C.F.R. § 120.17(a)(4).

Defendants contend that Relator has not sufficiently alleged an actual ITAR violation because he has not pled with particularity "that Defendants sent, transferred, or disclosed to foreign nationals technical data . . . relating to a particular defense article." Mot. (Doc. 34) at 11:18-20.   Instead, Relator alleges that during the migration of WEDC's servers and computers to the Microsemi domain, "all domain administrators[,]" authorized and unauthorized, foreign or otherwise, had "*avail*[*ability*] and *access*[]" to "protected or confidential WEDC information[.]"   AC (Doc. 38) at 27, ¶ 38; 21, ¶ 26 (emphasis added).   During this same timeframe, Relator advised Microsemi that "anyone with domain administrator rights *could* traverse the entire domain and *could* grant themselves additional rights."   (*Id.*) at 30, ¶ 43 (emphasis added).

Conspicuously absent from the AC, however, are any allegations that a "foreign person" actually "grant[ed] themselves" such "additional rights[.]"   *See* AC (Doc. 38) at 30, ¶ 43.  Nor does the AC contain any allegations thereafter that an unauthorized domain administrator actually sent, took, transferred or disclosed any ITAR protected data.  A theoretical ITAR violation simply cannot form the basis for a FCA claim.  At most, these

alleged ITAR violations amount to nothing more than "an unadorned, the-defendant-unlawfully-harmed-me accusation[,]" which is  far cry from meeting *Iqbal/Twombly*'s heightened pleading requirements.  *See Iqbal*, 556 U.S., at 678 (citing *Twombly*, 550 U.S., at 555).  Relator impermissibly equates availability and access with unlawful exportation.  *See*  AC (Doc. 38) at 21, ¶ 26.

Moreover, although the AC alleges that Mircosemi "admitted" ITAR violations to the United States, AC (Doc. 38) at 16, ¶ 17; 20, ¶ 24, this is not so.  Consequently, Relator cannot rely upon these purported admissions as a basis for alleging an actual ITAR violation.  Microsemi's voluntary notifications to the DDTC mention "*possible* violations*" of ITAR and "*possible* inadvertent violations" of ITAR - not actual ITAR violations.  Decl'n (Doc. 34-1), exh. 1 at 4 (emphasis added); exh. 2 at 7 (emphasis added).  In a similar vein, in its November 11, 2010, initial notification, Microsemi advised of "a *possible* gap in [its] IT systems, that *may* have enabled three foreign national employees . . . to gain access to servers that contain ITAR-controlled information without authorization from the [DDTC]."  *Id.*, exh. 1 at 4 (emphasis added).  Also at that time, Microsemi advised the DDTC that is had "no reason to believe that . . . any foreign national actually accessed ITAR-controlled data, or that they any 'deemed export' occurred with respect to such data." (*Id.*)  After conducting its own investigation, as detailed in its February 15, 2011 supplement to its initial notification, Microsemi stated that it did "not believe that any ITAR violations have occurred in connection with the three domain administrators' access rights."  (*Id.*, exh. 2 at 10).  Thus, Defendants maintain, and the Court agrees, that these voluntary notifications do not support the AC's allegations that Microsemi admitted ITAR violations.

Perhaps realizing that the allegations of admissions by Microsemi are untenable, Relator is backpedaling from such allegations.  Relator is now of the view that whether or not Microcsemi admitted ITAR "disclosures is not relevant to the question of whether [he] has adequately pleaded that disclosures or transferred happened."  Resp. (Doc. 41) at 18:14-19:2.  Relator focuses, instead, on the allegations that Microsemi migrated

WEDC's servers and computers to Microsemi's own shared domain.  With no analysis or explanation, Relator baldly asserts that it "is obvious that 'migrating' or moving all of WEDC's electronic information to a domain shared with all Microsemi divisions and subsidiaries constitutes a 'transfer.'"  Resp. (Doc. 41) at 18:6-9.  Then, relying upon one definition of "disclose" from Merriam-Webster's online dictionary, Relator strongly implies that because WEDC's electronic information was "'expose[d] to view[,]'" it was disclosed within the meaning of 22 C.F.R. § 120.17, regardless of whether such information was actually "viewed[.]"   *See id*. at 18:10-11, n. 40 (citing http://ww.merriam-webster.com/dictionary/disclose).

This, too, is an untenable position and is at odds with the regulation itself and the canons of regulatory construction, as Defendants argue in rejoinder.  To "export" within the meaning of section 120.17(a)(4) means, *inter alia*,  to "[d]isclos[e] (including oral or *visual* disclosure) or transferring technical data to a *foreign person*[.]"  22 C.F.R. § 120.17(a)(4) (emphasis added).  Allegations that Microsemi migrated technical data to a shared domain, especially when unaccompanied by allegations that such data was disclosed or transferred "to a foreign person" are not sufficient to plead an ITAR violation.  Indeed, Relator's strained reading of section 120.17(a) disregards the general principle that "the plain meaning of an administrative regulation controls."  *See Pacific Bell Tel. Co. v. California Pub. Util. Comm'n*, 621 F.3d 836, 848 (9th Cir. 2010) (citation omitted).

Construing "disclose" to mean exposing something to view, such as technical data, would violate another canon of regulatory construction.  That is, that regulations "should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *See United States v. Grandberry*, 730 F.3d 968, 981 (9th Cir. 2013) (citing *Corley v. United States*, 556 U.S. 303, 314 (2009)) (other citations and quotation marks omitted).  Relator's reading renders the phrase "to a foreign person," 22 C.F.R. § 120.17(a)(4) "inoperative or superfluous, void or insignificant."  *See id.*  Under Relator's interpretation of section 120.17(a), the mere act

of exposing technical data to view is an ITAR violation, regardless of whether the exposure was actually "to a foreign person" -- an obviously critical element of this regulation.  The Court cannot countenance such an interpretation.  Finally, the Court is compelled to comment that in his response, Relator, albeit in the context of his worthless products arguments,  seemingly concedes that he "lacks knowledge as to whether anyone actually saw, looked at, copied, or further disclosed the protected data[.]"  Resp. (Doc. 41) at 8:6-7.

### c.  Materiality

Focusing on "'whether the false statement is the cause of the Government's providing the benefit; and . . . whether any relation exists between the subject matter of the false statement and the event triggering Government's [sic] loss[,]'" the Ninth Circuit has held that a false statement "must be material to the government's decision to pay out moneys to the claimant."  *Hendow*, 461 F.3d at 1172 (quoting *Hopper*, 91 F.3d at 1266).  A false statement is material if "it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Bourseau*, 531 F.3d at 1171  (internal quotation marks omitted) (alteration in original). The natural tendency test "focuses on the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered."  *Id*.  Simply put, "materiality is satisfied . . . only where compliance is a  '*sine qua non* of receipt of state funding.'"  *Ebeid*, 616 F.3d at 998 (quoting *Hopper*, 91 F.3d at 1276).

Defendants argue that Relator's implied false certification claim is deficient because he has not adequately pled materiality.  Defendants' argument substantially mirrors their argument that ITAR compliance is not a condition of payment.  In his response, Relator likewise contends that "[f]or the same reasons [he] has shown that the implied false certifications were conditions of payment, [he] has adequately and plausibly alleged" materiality. Resp. (Doc. 41) at 19:16-18.  Given the obviously close relationship between compliance as a condition of payment and materiality, which the parties recognize, the Court's analysis of the former is dispositive of the latter.  To reiterate,

because the AC does not allege that any government payment was "*explicitly conditioned*" on ITAR compliance, materiality has not been sufficiently pled here. *See Hendow*, 461 F.3de at 1175. To briefly reiterate, because the AC does not allege that any government payment was "explicitly conditioned" on ITAR compliance, the materiality standard has not been sufficiently pled. *See Ebeid*, 616 F.3 at 997. Having found that Relator did not adequately plead that certification of ITAR compliance is a condition of government payment, necessarily, the Court also finds that he has not adequately plead that the alleged ITAR violations are material to payment.

### d.  Submission of Claims

Even if Relator had adequately plead the other elements of an implied false certification claim, dismissal is mandated, Defendants argue, because the AC does "not pled with particularity the submission of any relevant claim for payment." Mot. (Doc. 34) at 14:6-7. Relator has not "sufficiently alleged the 'who, what, when, where, and how' needed to plead the submission of false claims." Reply (Doc. 50) at 2:23-25 Defendants further assert that Relator, likewise, "has not identified even one specific 'representative example' of a claim of reimbursement from government funds for a product linked to the alleged ITAR violation." Mot. (Doc. 34) at 14:20-21. Relator counters that his "extensive documentation . . . support[s] a reasonable inference [that] the claims were submitted to the Government by prime contractors, and no specific false claim or representative examples of those claims for payment are required." Resp. (Doc. 41) at 20:16-18 (footnote omitted).

"'It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim.'" *Cafasso*, 637 F.3d at 1055 (quoting *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir. 2002). This is because "the [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Id.* (internal quotation marks and citation omitted). The FAC "focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme."

*Aflatooni*, 314 F.3d at 102 (citation omitted).  For this submission of claim element, "[a]ll that matters is whether the false statement or course of conduct causes the government to pay out money or to forfeit moneys due."  *Hendow*, 461 F.3d at 1177 (internal quotation marks and citation omitted).   "[F]or a false statement or course of action to be actionable under the false certification theory of false claims liability, it is necessary that it involve an actual *claim*, which is to say, a call on the government fisc."  *Id*. at 1173.  "This is self-evident from the statutory language, of course, which requires a 'claim paid or approved by the Government.'"  *Id*. (quoting 31 U.S.C. § 3729(a)(2)).

"To survive a Rule 9(b) motion to dismiss, a complaint alleging implied false certification must plead with particularity allegations that provide a reasonable basis to infer," among other things,  that "claims were submitted."  *Ebeid*, 616 F.3d at 998. While a plaintiff need not "identify representative examples of false claims to support every allegation," he must at least allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Id*. at 998–99 (internal quotation marks, citations and footnote omitted).  "The Rule 9(b) standard may be satisfied by pleading with particularity a reasonable basis to infer that the government either paid money or forfeited moneys due."  *Id*. at 999, n. 4.  Therefore, "[i]t is not enough . . . to describe a [fraudulent] scheme in detail but then to allege simply and without any stated reason . . . that claims requesting illegal payments must have been submitted."   *Aflatooni*, 314 F.3d at 1002 (internal quotation marks and citation omitted).  Yet, this is in essence what Relator has done here.

The AC sweepingly alleges as follows:

> Since 2009, Microsemi has submitted and caused WEDC to submit invoices for payment to Government contractors for ITAR- or EAR-related work totaling more than $1.6 billion, and it has caused the government's prime contractors to unwittingly submit, concurrently with Microsemi's and WEDC's ongoing ITAR violations, invoices totaling sums far greater than that amount charged for ITAR- and EAR-protected technology products manufactured by Microsemi's numerous subsidiaries, including WEDC.

AC (Doc. 38) at 41, ¶ 67.  This is akin to the allegations in *United States ex rel. Sallade v.*

*Orbital Sciences Corp.*, 2008 WL 724973 (D.Ariz. March 17, 2008), where Relator alleged that "every invoice [Defendant] submitted under the . . . contract was fraudulent." *See id.* at \*3.   "This kind of general allegation assumes that [Defendant] actually submitted an invoice and does not satisfy Rule 9(b)[,]" the Court held.  *Id*.

In this respect, *Sallade* is indistinguishable from the present case.  Relator has not alleged with the requisite particularity that Defendants actually submitted an actual claim or request for payment to the government.  Likewise, the AC does not include sufficient factual content from which the Court could reasonably infer the submission of a false claim.   "[T]he absence that a false certification was submitted is a 'fatal defect' to an FAC claim."  *Gonzalez*, 2012 WL 2412080, at \*6 (quoting *Hopper*, 91 F.3d at 1267).

### e.  Scienter

Defendants further assert that Relator's false certification claim cannot survive this motion to dismiss because he has failed to plead any facts showing that they acted with the requisite scienter.  Relator counters that the alleged facts "give rise to a reasonable inference" of scienter. Resp. (Doc. 41) at 21:2.  Significantly, Relator does not reference any of those facts, noting instead that he has "pleaded that Defendants *purported to be knowledgeable* of ITAR[.]"   *Id*. at 21:5-6.   The AC does allege such purported knowledge, but that is not tantamount to scienter as the FCA defines it.

Since *Hopper*, 91 F.3d 1261, the Ninth Circuit has "emphasized the central importance of the scienter element to liability under the False Claims Act, holding that false claims must in fact be "'false when made.'"   *Hendow*, 461 F.3d at 1171-1172 (quoting  *Hopper*, 91 F.3d at 1267) (other citation omitted).   "Under the False Claim Act's scienter requirement, 'innocent mistakes, mere negligent misrepresentations and differences in interpretations' will not suffice to create liability."  *Corinthian Colleges*, 655 F.3d at 996 (quoting *Hendow*, 461 F.3d at 1174 (internal citations, quotation marks, and alterations omitted)).   "Instead, Relators must allege that [Defendant] knew that its statements were false, or that it was deliberately indifferent to or acted with reckless disregard of the truth of the statements."  *Id*. (citing *U.S. ex rel. Hochman v. Nackman*,

145 F.3d 1069, 1074 (9th Cir. 1998) ("Absent evidence that the defendants knew that the . . . . Guidelines on which they relied did not apply, or that the defendants were deliberately indifferent to or recklessly disregardful of the alleged inapplicability of those provisions, no False Claims Act liability can be found.")).  The Ninth Circuit has stated that "[t]he phrase 'known to be false' . . . means [known to be] 'a lie.'"  *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th 1992), *overruled on other grounds*, *Hartpence*, 792 F.3d 1121.  Unlike the "'circumstances constituting fraud or mistake[]'" which must be alleged with particularity, "conditions of a person's mind[,]" such as scienter, can be alleged generally.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (quoting Fed.R.Civ.P. 9(b)).

Relator's allegations do not satisfy even this lower pleading threshold.  The AC is void of any allegations that Defendants made a claim which they knew to be false, *i.e.*, known to be a lie.  In addition, Relator has not identified any facts whatsoever, much less those supposedly "giv[ing] rise to a reasonable inference" that Defendants' acted with "knowledge or reckless disregard" in certifying ITAR compliance.  *See* Resp. (Doc. 41) at  21:2-3.  The Court will not scour Relator's AC looking for allegations to support this contention.  Indeed, if the Court were to do so, "it would be impermissibly taking on the role of advocate, rather than impartial decision-maker."  *See Mann v. GTCR Golder Rauner, L.L.C.*, 438 F.Supp.2d 884, 891 (D.Ariz. 2007).

Relator does specify allegations which in his view show that "Defendants *purported to be knowledgeable* of ITAR[.]"  Resp. (Doc. 41) at 21:6; *see id.* at 21, n. 42 (citations to complaint).  For example, Relator alleges that not long after the announcement that Microsemi was acquiring WEDC, he was informed that "Microsemi has a lot of facilities that perform ITAR-related work, that Microsemi is fully versed in ITAR, and that . . . Microsemi's Senior Vice President of Operations, who was responsible for Microsemi's IT department, was an expert in ITAR."  AC (Doc. 38) at 22, ¶ 27.  Nonetheless, the Court fails to see how such allegations plead or support a reasonable inference that Defendants certified ITAR compliance while knowingly or

recklessly disregarding that they were not ITAR compliant.  Furthermore, the AC does not identify a single employee of Defendants who allegedly certified ITAR compliance, much less that that person knew of or recklessly disregarded the shared domain which is the basis for Relator's claim of ITAR violations.  In short, none of the facts as plead and identified by Relator supports his conclusory allegation that "Defendant [sic] knowingly caused WEDC to present false or fraudulent claims[.]"  (*Id*. at 44, ¶ 75).

As the foregoing demonstrates, Relator has not adequately pled any of the elements of an implied false certification claim.  The Court must, therefore, consider whether the AC "warrants an inference that false claims were part of the scheme alleged." *Cafasso*, 636 F.3d at 1056 (citation omitted).  "In assessing the plausibility of an inference, [the Court] 'draw[s] on [its] judicial experience and common sense,' *Iqbal*, 129 S.Ct. at 1950, and consider[s] ''obvious alternative explanation[s][.]''" *Id*. (quoting *Iqbal*, 129 S.Ct. at 1952) (quoting *Twombly*, 550 U.S. at 567)).  Engaging in this assessment, this Court finds that, at most, the AC pleads the "sheer possibility" that Defendants violated the FCA.  *See Iqbal*., 556 U.S., at 678.  The AC's vague, diffuse and sweeping allegations are insufficient to cross the line from possibility to probability.

As can be seen, at most the AC alleges violations of the ITAR.  The Ninth Circuit has consistently held, however, that "mere regulatory violations to not give rise to a viable FCA action." *See Hopper*, 91 F.3d at 1267.  This case is no different than *Hopper* in that ITAR compliance simply is not "a *sine qua non*" of receipt of government payment.  *See id*.  Hence, FCA liability "cannot attach[.]"  *See Ebeid*, 616 F.3d at 997. Relator seems to be operating under the misconception that "any breach of contract, or violation of regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA[,]" but this is not so.  *See Hopper*, 91 F.3d at 1265.  At the end of the day, it strikes the Court that as in *Ebeid*, Relator's AC is akin to a "global indictment" of Microsemi's business practices with respect to ITAR-controlled information and products and otherwise.[8]  *See*

---

[8]     In the AC's introduction, Relator alleges in great detail that what he

1    *Ebeid*  616 F.3d at 1000.  Such an indictment does not transform the alleged conduct into

2    a viable cause of action under the FCA, however.

3    ### C.  Possible Amendment

4    Defendants are seeking dismissal of the AC with prejudice.  Anticipating that

5    Relator may seek leave to amend, Defendants argue that the Court should not allow

6    amendment because it would be futile to do so.  Amendment would be futile primarily

7    because "alleged ITAR violations cannot provide a basis for FAC falsity, materiality, or

8    scienter as a matter of law."  *See* Mot. (Doc. 34) at 17 n. 5.  If the Court finds, as it has,

9    that Relator has failed to state a FCA claim, he is seeking leave to amend on the basis that

10   he has "uncover[ed] additional information to provide additional particularity and

11   plausibility to his Complaint."   Resp. (Doc. 41) at 21:16-17.   This information

12   "preced[es] the 2010 series of events" which the AC alleges.  (*Id*. at at 21:19).

13   Federal Rule of Civil Procedure 15(a) provides that leave to amend should be

14   freely given "when justice so requires."  Hence, "[t]he standard for granting leave to

15   amend is generous."  *Corinthian Colleges*, 655 F.3d at 995 (internal quotation marks and

16   citation omitted).  However, in exercising its discretion, courts may decline to grant leave

17   to amend upon a showing of "'undue delay, bad faith or dilatory motive on the part of the

18   movant, repeated failure to cure deficiencies by amendments previously allowed, undue

19   prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of

20   amendment[.]'"  *Sonoma County Ass'n of Retired Employees v. Sonoma County*,   708

21   F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  In

22   assessing futility, "denial of a motion to amend is proper if it is clear 'that the complaint

23   would not be saved by any amendment.'"  *Hildes v. Arthur Andersen LLP*, 734 F.3d 854,

24   859 (9th Cir. 2013) (internal quotation marks and citation omitted), *cert. denied sub nom.*

25   *Moores v. Hildes*, 135 S.Ct. 46 (2014).

26   The shortcomings in Relator's AC are many and varied, as fully discussed herein.

27

28   _____

characterizes as Microsemi's "aggressive[]" acquisition of a number of technologies.  *See*
AC (Doc. 38) at 5:7, ¶ 4, n. 1-26.

Even if some flaws could be cured by amending "to provide additional particularity," as Relator urges, still, the AC could not be saved by amendment. This is because Relator's two theories of liability, even with amendment, could not "plausibly give rise to an entitlement to relief" under the FCA. *See Iqbal*, 556 U.S., at 679. For the reasons set forth herein, Relator has failed to state a claim for FCA liability under a worthless products theory. This particular claim fails not due to a lack of particularity, but because it is not a legally viable claim in the first instance. Amendment as to this specific theory of FCA liability would thus be futile.

Nor can Relator's implied false certification claim be cured by amendment. This claim is fundamentally flawed at its most basic level -- a flaw which amendment cannot cure. In this Circuit, "[t]he prevailing law is that 'regulatory violations do not give rise to a viable FCA action' unless government payment is expressly conditioned on a false certification of regulatory compliance." *United States ex rel. Swan v. Covenant Care, Inc.*, 279 F.Supp.2d 1212, 1221 (E.D.Cal. 2002) (citing, *inter alia*, *Anton*, 91 F.3d at 1266 ("It is the false *certification* of compliance which creates liability [under the FCA] when certification is a prerequisite to obtaining a government benefit") (emphasis in original)). As fully discussed herein, the alleged ITAR violations cannot be a predicate to FCA liability on a theory of implied false certification because compliance therewith is not a *sine qua non* of receipt of government payment. So, even if Relator could come forth with more particulars, such as identifying a Microsemi employee who affirmatively acted to gain access, and did, in fact gain access to ITAR protected data, such an amendment could not cure this fundamental flaw.

There is also a temporal aspect to the Court's finding that amendment would be futile. The AC alleges that ITAR violations occurred during the roughly six months following Microsemi's acquisition of WEDC, namely from April through late October of 2010. Yet, now Relator wants to amend his AC to include unspecified information "*preceding* the 2010 series of events described in the Complaint." Resp. (Doc. 41) at 21:19-20 (footnote omitted) (emphasis added). Clearly such events could not arise out of

the same ITAR violations alleged herein.

In light of the foregoing, the Court finds that it would be futile to allow amendment.  Consequently, in the exercise of its discretion, the Court dismisses Relator's Amended Complaint (Doc. 38) with prejudice.  *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (internal quotation marks and citations omitted) ("[D]ismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment.")

**IV.  Conclusion**

Accordingly, for the reasons set forth herein,

**IT IS HEREBY ORDERED GRANTING** with prejudice Defendants' Motion to Dismiss Relator's First Amended Complaint (Doc. 34).

Dated this 30th day of September, 2015.

Honorable Diane J. Humetewa
United States District Judge